FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 APR -5 PM 2: 40

U.S. DISTRICT COURT
N.D. OF ALABAMA

CRYSTAL MATTHEWS and )
LETITIA RUTLEDGE, )
)
Plaintiffs, ) CV-97-P-1071-S
-vs.- )
)
FLAGSTAR ENTERPRISES, INC. )
and JOHN JACKSON, )
) ENTERED
Defendants. )

APR 0 5 1999

## MEMORANDUM OPINION

Before the court are cross-motions for partial summary judgment that were taken under submission after the May 29, 1998 motion docket. The defendants filed a Motion for Partial Summary Judgment on January 30, 1998, and the plaintiffs filed their Motion for Partial Summary Judgment on May 26, 1998. Pursuant to this court's January 28, 1999 Order, the defendant filed an amended answer and the parties filed supplemental briefs. The motions were re-submitted for decision as of March 26, 1999. After careful consideration of the briefs and evidence submitted by the parties in this case, the court finds that the defendants' Motion for Partial Summary Judgment is due to be granted. The plaintiffs' motion is due to be denied. Furthermore, the court declines to exercise jurisdiction over the remaining state law claims under 28 U.S.C. § 1367 (c)(4).

### Facts

The two plaintiffs in this case worked at the same Hardee's restaurant in Birmingham, Alabama. Both women claim that John Jackson, one of the managers in their store, sexually harassed them during the time in which they were employed with Hardee's. The plaintiffs filed

suit against Flagstar Enterprises, Inc. ("Flagstar")[1] and John Jackson alleging violations of Title VII (quid pro quo and hostile environment), and various state law claims.[2]

I. Letitia Rutledge

Plaintiff Letitia Rutledge began working for Hardee's on July 29, 1995 as a cashier. At the time she was hired, Rutledge was given a Hardee's employee handbook which contained Flagstar's sexual harassment policy and complaint procedure. Rutledge also participated in an orientation that detailed Flagstar's employment policies and procedures.[3] Hardee's sexual harassment policy states that an employee may complain to a "supervisor, any member of management and/or an appropriate Human Resources representative" or call the "1-800" number to report incidents of harassment. The policy states also that "an employee is not required to follow the normal chain of command to report harassing situations" and "may report situations of harassment without fear of reprisal." The sexual harassment policy is displayed on a poster at each store and lists the "1-800" number, and directs employees to contact the Regional Human

---

[1] Flagstar Enterprises, Inc. d/b/a Hardee's.

[2] The plaintiffs' state law claims include: negligent and/or wanton supervision, negligent retention, assault, battery, invasion of privacy, and outrage.

[3] Hardee's stores are divided into areas containing ten to twelve stores. Each store has a general manager, one senior assistant manager, and one assistant manager. A store may also have one or two interns, who are also called "shift leaders." In 1995, each store had one or more hourly customer relations persons ("CRPs") who were in charge of the cashiers. Each store also had various hourly employees such as cooks and cashiers. Only an employee area supervisor or higher management has the authority to hire, fire, demote, or otherwise discipline or investigate complaints against a general manager. Only a general manager or higher has the authority to investigate employee complaints. (Declaration of Bonnie Corbett, Defendant's Supplemental Exhibit 1).

2

Resources Manager if uncomfortable talking with their supervisors. The harassment policy also instructs employees to contact the Regional Human Resources Manager or higher levels of management if their complaints are not resolved at their individual store level.

Rutledge asserts that John Jackson, her manager, touched her inappropriately on three occasions. First, Rutledge alleges that in late August 1995, Jackson asked her to go to the freezer to get french fries. While she was in the freezer, Jackson entered and asked her for a hug. She also alleges that Jackson touched her breasts and buttocks. After finding it difficult to push Jackson away and leave the freezer, Rutledge asked Jackson to let her out of the freezer, which he did. Rutledge told another hourly employee about the incident.

The second incident allegedly occurred a few days later, on August 23, 1995, when Jackson asked Rutledge to return to the freezer to retrieve something. According to Rutledge, Jackson once again followed her into the freezer and began touching her breasts and buttocks. After Rutledge told Jackson to stop, he allegedly replied, "Okay, then. I'm sorry." After this incident, Rutledge told Sherry Crenshaw, a shift leader, about her encounter with Jackson. Crenshaw allegedly told Rutledge that Jackson had also made advances toward her. Crenshaw said that she once she told him to stop, he did. During this conversation, Crenshaw told Rutledge to contact District Manager Jennifer Bullard, Jackson's immediate supervisor, or Bonnie Corbett, the Human Resources Manager. Rutledge never talked to either Bullard or Corbett.

The final incident also occurred on August 23, 1995. Jackson allegedly asked Rutledge to clean the bathroom in the restaurant. While Rutledge was cleaning the bathroom, Jackson came in, locked the door, and proceeded to touch her breasts and buttocks. Rutledge also contends that her pants became unzipped. Once again, Rutledge asked him to stop and pushed him away. Jackson

1

replied, "Okay. All right," and left. Not long after this incident on August 23, Rutledge told assistant manager/intern Darron Wells about the incidents and that she was quitting. Wells did not inform upper management or the HR manager of what Rutledge told him.[4]

Corbett, the HR manager, began investigating Rutledge's complaint after learning of the alleged incidents of harassment from Rutledge's mother several days after Rutledge quit. Although Corbett was unable to interview Rutledge, Corbett went to the Hardee's where Rutledge worked and interviewed all of the employees, including Jackson.[5] Although none of the employees could corroborate Rutledge's story, one employee, Crystal Matthews, indicated to Corbett that she had previously had "an issue" with Jackson, but did not want to talk about it. According to Corbett, Matthews did not indicate that the problem with Jackson was sexual in nature. In fact, she denied ever being touched by Jackson. Wells, the assistant manager/intern that Rutledge complained to the day she quit, told Corbett that both Matthews and Rutledge had told him that Jackson had touched them. Because Corbett concluded that there was no corroborating evidence of the alleged harassment or

---

[4] Several days after Rutledge quit, Rutledge's mother left a voice mail message with Bonnie Corbett, complaining of her daughter's harassment by Jackson. Corbett immediately called Rutledge's mother. Both Rutledge and her mother refused to talk to Corbett and told her to talk to an attorney, Amy Taylor. Corbett called Taylor and was informed that Taylor was meeting with Rutledge that same day and that Taylor would call Corbett after the meeting. Taylor never called Corbett.

[5] It appears that Corbett asked five standard, pre-written questions to each person she interviewed. However, not all employees were interviewed. According to Corbett's own testimony, she did not ask any follow-up questions when certain employees told her of "rumors" about fellow employees involved in sexual harassment. When Corbett interviewed Jackson, she did not write down his responses to the questions because Jackson had already given a written statement. After Corbett's investigation was through, she sent her interview notes and Jackson's statement to the home office.

2

prior incidents reported against Jackson,[6] and because Corbett was unable to speak with Rutledge, Corbett concluded that there was no evidence of harassment.

## II. Crystal Matthews

The second plaintiff in this case, Crystal Matthews, began working for Hardee's in April 1993. Matthews received the same employee manual and went through the same orientation as Rutledge. In fact, because Matthews quit for a brief period of time and was then re-hired in March 1994, she actually went through the orientation twice.

Matthews alleges that Jackson first sexually harassed her in the Summer 1994. According to Matthews, Jackson told her to go into the cooler to get salad. After Matthews entered the cooler, Jackson allegedly came in behind her and grabbed her breasts from behind and told her that he wanted a hug. When Matthews told him to stop and pushed him away, Jackson stopped. Several months later, Jackson allegedly harassed Matthews again in the bathroom. Matthews does not remember where he tried to touch her and she admits that she did not tell anyone about the incident. A similar incident occurred on another occasion sometime later. This time, Matthews told two co-workers about the incident.

Early in August 1995, Matthews asserts that Jackson harassed her again. According to Matthews, Jackson told her to go into the bathroom with him so that he could show her what to do. Once in the bathroom, Jackson shut the door and pushed himself against her and grabbed her

---

[6]Several months after the investigation of Rutledge's complaint, Corbett received a complaint that Jackson improperly touched Tomichael Thetford. Corbett was informed of the alleged harassment by Jennifer Bullard, the area manager, who learned of the incident from Fred Harris, a general manager. Thetford had initially complained to Harris about Jackson.

3

buttocks. Matthews told assistant manager Tomichael Thedford about the incident and that the management needed to do something to stop Jackson's behavior. Matthews also told shift leaders Wells and Crenshaw about the incidents with Jackson. Wells did not believe her and did not report the incident. Matthews does not recall what Crenshaw or Thedford told her to do about her complaint. Matthews did not contact Bonnie Corbett, the HR department, or call the "1-800" complaint number. Similar bathroom incidents allegedly occurred on at least four other occasions.

In January 1995, Matthews received a raise. According to Matthews, seven months later Jackson said, "I gave you a raise so when are you going to give me some of that ass?"

During Corbett's investigation of Rutledge's complaint, Corbett interviewed Matthews. Corbett asked a series of questions, including whether Matthews had any problems with Jackson and if any inappropriate conduct was occurring. Matthews stated that there had been an "issue" with Jackson but would not elaborate any further. As to questions about whether there was any inappropriate conduct, Matthews answered, "Not that I know of." Matthews now claims that her denial to Corbett was a lie that was justified because she did not have a lawyer at the time. Matthews also asserts that she felt that if Jackson found out she would lose her job or suffer retaliation. Matthews quit her job at Hardee's in March 1996.

After receiving their Right to Sue letters from the EEOC, the plaintiffs filed suit on April 30, 1997.

Analysis

III. Quid Pro Quo

Quid pro quo and hostile work environment claims are both cognizable under Title VII. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). However, for a quid pro quo claim

4

to survive summary judgment, there must be some evidence that a threat to the employee's compensation, terms, conditions, or privileges of employment was actually carried out. "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257, 2264 (1998). Without more than mere unfulfilled threats, the plaintiff is left with only a claim for hostile work environment, which requires a showing of severe or pervasive conduct. Id.; see also Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998).

In this case, neither plaintiff has presented any evidence of a tangible employment action that resulted from the alleged actions of Jackson.[7] In fact, Matthews received at least one raise. While the plaintiffs may have a claim for hostile work environment, their claims for quid pro quo harassment cannot survive summary judgment. The defendant's motion for summary judgment on this claim is due to be granted.

## IV. Hostile Work Environment

A prima facie case of sexual harassment requires the plaintiff to show that: (1) she belongs to a protected group; (2) she was the subject of unwelcome sexual advances; (3) she was harassed because of her sex; and (4) the harassment was severe or pervasive enough to affect the terms, conditions, or privileges of employment and create an abusive working environment. See Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998). For purposes of this summary judgment motion, the court will assume that the plaintiffs in this case have presented a prima facie case of harassment. However, as a result of the decision in Faragher v. City of Boca Raton, there is now has a recognized

---

[7]Neither plaintiff asserted a claim for constructive discharge.

5

defense to liability. Id. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Industries, 118 S.Ct. at 2270 (referring to the holding in Faragher). The reasonableness of the actions of both the plaintiffs and the defendants are important in assessing liability.

In this case, the defendant promulgated a sexual harassment policy and had established procedures for reporting any incidents of harassment. The policy and procedures were given to each employee and each employee was required to attend an orientation seminar in which the policy and procedures for reporting harassment were explained. Both of the plaintiffs admit receiving the employee handbook containing the policy and procedures and attending the orientation. Indeed, one of the plaintiffs attended the orientation seminar twice. Although neither the existence of a company grievance procedure nor the absence of actual notice of the harassment on the part of upper management is dispositive of a claim for sexual harassment, both are relevant to the issue of liability. Faragher, 118 S. Ct. at 2293. This is especially true when, as here, the persons complaining of the harassment do not utilize the established reporting procedures. Rutledge, well aware of the policy and procedures for reporting sexual harassment, did not contact Corbett, the HR office, or call the "1-800" number. While she apparently did tell several co-workers and her shift manager, Sherry Crenshaw, on the day of her resignation, she did not inform upper level management after her concerns were not addressed. Crenshaw even encouraged Rutledge to contact Jackson's supervisor, a person who would be able to act on her complaint. Rutledge did not contact Jaskson's supervisor, even though she admits that she knew that she should complain to his supervisor. Furthermore, after

6

her mother left a message with Corbett regarding harassment at Hardee's, Rutledge did not allow any remedial action by the defendant because she quit her job within 3 days of the first alleged incident. Even after leaving her job, Rutledge would not cooperate with Flagstar's investigation into the alleged incidents. As such, Rutledge "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." Burlington, 118 S. Ct. at 2270. No reasonable jury could find otherwise.

As to Matthews, although she complained to several co-workers and shift managers, she did not report any of the incidents to upper level management or call the toll-free number as instructed in her employee manual. Furthermore, even when Corbett asked Matthews about Jackson and any inappropriate conduct during the investigation into the Rutledge complaint, Matthews did not reveal any of her alleged incidents with Jackson. In fact, Matthews stated that she had no problem with Jackson and did not know of any inappropriate conduct going on at the store. Matthews claims that she did not tell Corbett about her alleged incidents with Jackson because she did not have a lawyer at the time and because she felt that she would be retaliated against. However, a generalized fear of retaliation "can never constitute reasonable grounds for an employee's failure to complain to his or her employer." Fierro v. Saks Fifth Avenue, 13 F. Supp. 2d 481, 491 (S.D. N.Y. 1998). Further, although "Federal law has now attempted to correct the problem of workplace discrimination . . . it cannot be done without the cooperation of the victims, notwithstanding that it may be difficult for them to make such efforts." As with Rutledge, there is no genuine issue of material fact with regard to Matthews' reasonable cooperation in the harassment investigation. Matthews failed to act reasonably in connection with Hardee's investigation into the claims of harassment. Rather than answering the investigator's questions honestly in order to allow for remedial action to be taken,

7

Matthews denied any knowledge of harassment, quit her job, and filed EEOC charges. Had Matthews acknowledged to Corbett that she was harassed by Jackson, remained employed, and if no remedial action had been taken, then this would be a different case. However, given the facts of this case, there are no genuine issues to submit to a jury and the defendants are entitled to summary judgment as a matter of law on this claim.

## Conclusion

For the foregoing reasons, the court finds that the defendants' summary judgment is due to be granted as to the plaintiffs' sexual harassment claims. The court declines to exercise jurisdiction over the remaining state law claims.

Date: April 2, 1999.

Chief Judge Sam C. Pointer, Jr.

Service List:
    Stephen A. Strickland
    Richard S. Jaffee
    John W. Sheffield
    David T. Payne
    Andrew G. Allen